Slip Op. 16-24

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| SHIJIAZHUANG GOODMAN TRADING CO., LTD., | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | Before: Timothy C. Stanceu, Chief Judge |
| Defendant, | Court No. 14-00101 |
| and | |
| FRESH GARLIC PRODUCERS ASSOCIATION, ET AL., | |
| Defendant-intervenors. | |

## OPINION AND ORDER

[Remanding an agency decision to rescind a "new shipper" review of an antidumping duty order]

Dated: March 22, 2016

*Robert T. Hume*, Hume & Associates, LLC, of El Prado, NM, for plaintiff Shijiazhuang Goodman Trading Co., Ltd.

*Richard P. Schroeder*, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., for defendant United States. With him on the brief were *Joyce R. Branda*, Acting Assistant Attorney General, *Jeanne E. Davidson*, Director, and *Reginald T. Blades, Jr.*, Assistant Director. Of counsel on the brief was *Khalil N. Gharbieh*, Attorney, Office of Chief Counsel for Trade Enforcement and Compliance, U.S. Department of Commerce.

*Michael J. Coursey*, Kelley Drye & Warren, LLP, of Washington D.C., argued for defendant-intervenors Fresh Garlic Producers Association, Vessey and Company, Inc., The Garlic Company, Christopher Ranch, L.L.C., and Valley Garlic. With him on the brief was *John M. Herrmann II*.

Stanceu, Chief Judge: Plaintiff contests a decision by the International Trade

Administration, U.S. Department of Commerce ("Commerce" or the "Department"), to rescind

an administrative "new shipper" review of an antidumping duty order on fresh garlic from the

People's Republic of China ("China" or the "PRC").  Plaintiff, Shijiazhuang Goodman Trading

Co., Ltd. ("Goodman"), a Chinese garlic exporter, requested the new shipper review, a procedure

that potentially allowed it to be assigned an individually-determined antidumping duty rate on its

garlic exports to the United States.

Before the court is plaintiff's motion for judgment on the agency record, filed pursuant to

USCIT Rule 56.2.  Concluding, *inter alia*, that Commerce failed to base its decision to rescind

the review on the record evidence considered as a whole, the court orders a remand and directs

Commerce to reconsider its decision.

## I. BACKGROUND

### 1.  The Contested Decision

Contested in this litigation is *Fresh Garlic from the People's Republic of China: Final*

*Rescission of Antidumping Duty New Shipper Review of Shijiazhuang Goodman Trading Co.,*

*Ltd.*, 79 Fed. Reg. 22,098 (Int'l Trade Admin. Apr. 21, 2014) ("*Rescission*").  The published

decision incorporates by reference an "Issues and Decision Memorandum" that Commerce

described therein as addressing "all issues raised in the case and rebuttal briefs."  *Id.*; *see*

*Decision Mem. for the Final Results in the Antidumping Duty New Shipper Rev. of Fresh Garlic*

*from the People's Republic of China: Shijiazhuang Goodman Trading Co., Ltd.*, A-570-831,

APR 11-12, at 9 (Apr. 3, 2014) (Admin.R.Doc. No. 190), *available at*

http://enforcement.trade.gov/frn/summary/prc/2014-09015-1.pdf (last visited March 10, 2016)

("*Final Decision Mem.*").

Commerce issued the antidumping duty order on fresh garlic from the PRC (the "Order"),

to which the new shipper review pertained, in 1994.  *Antidumping Duty Order: Fresh Garlic*

*from the People's Republic of China*, 59 Fed. Reg. 59,209 (Int'l Trade Admin. Nov. 16, 1994).

<u>2.  The Department's New Shipper Review Proceeding</u>

Goodman originally filed its request for a new shipper review on November 27, 2012 and

amended that request on December 6, 2012.  *Fresh Garlic from the People's Republic of China –*

*Re-filing Request for Antidumping New Shipper Review of Shijiazhuang Goodman Trading Co.,*

*Ltd.* 1 n.1 (Dec. 6, 2012) (Admin.R.Doc. No. 4) ("*Request*").  Goodman based its new shipper

review request on its having made three shipments to the United States of fresh garlic from

China beginning in July 2012.  *Id.* at 1-2.  The garlic was produced by, and obtained by

Goodman from, Jinxiang Zhongtian Business Co., Ltd., a Chinese garlic producer.  *Id.* at 3.

On January 2, 2013, Commerce initiated the requested new shipper review according to

section 751(a)(2)(B) of the Tariff Act of 1930, 19 U.S.C. § 1675(a)(2)(B).[1]  *Fresh Garlic from*

*the People's Republic of China: Initiation of Antidumping Duty New Shipper Review;*

*2011-2012*, 78 Fed. Reg. 88 (Jan. 2, 2013) ("*Initiation*").  The review covered the period of

November 1, 2011 through October 31, 2012.  *Rescission*, 79 Fed. Reg. at 22,098.

On November 8, 2013, Commerce issued the preliminary results of the review

("Preliminary Results"), in which it concluded, preliminarily, that Goodman met the

requirements for a new shipper review and was entitled to an individually-determined

antidumping duty rate.  *Fresh Garlic From the People's Republic of China: Preliminary Results*

*of New Shipper Rev. of Shijiazhuang Goodman Trading Co., Ltd.*, 78 Fed. Reg. 67,112

---

[1] Statutory citations herein are to the 2012 edition of the United States Code, and citations
to regulations are to the 2014 edition of the Code of Federal Regulations.

(Nov. 8, 2013) ("*Prelim. Results*") and accompanying *Decision Mem. for the Preliminary Results of Antidumping Duty New Shipper Review of Fresh Garlic from the People's Republic of China: Shijiazhuang Goodman Trading Co., Ltd.*, A-570-831, ARP 11-12, at 1-2 (Nov. 4, 2013) (Admin.R.Doc. No. 141), *available at* http://enforcement.trade.gov/frn/summary/prc/2013-26861-1.pdf (last visited Mar. 10, 2016) ("*Prelim. Decision Mem.*").   Departing from its normal practice of expressing weighted-average dumping margins in ad valorem terms, Commerce preliminarily determined a per-unit dumping margin for Goodman, which was $0.44 per kg. *Prelim. Results*, 78 Fed. Reg. at 67,112.

### 3.  The Rescission of the New Shipper Review

Reversing the position it had taken in the Preliminary Results, Commerce issued its rescission of the new shipper review ("Rescission") on April 21, 2014.  *Rescission*, 79 Fed. Reg. at 22,098.

In the Rescission, Commerce reached several decisions.  It decided, first, that Goodman had no *bona fide* U.S. sales during the period of review and on that basis concluded that the ongoing new shipper review must be rescinded.  *Id.*, 79 Fed. Reg. at 22,098; *Final Decision Mem.* 9.  Second, Commerce decided that, because of the rescission of the new shipper review, "we are not considering Goodman's application for a separate rate in this segment of the proceeding, nor are we reviewing the PRC entity." *Final Decision Mem.* 9.  Referring to the eighteenth periodic administrative review of the Order, Commerce added that "[w]e note that Goodman's entries are under review in the concurrent administrative review . . . and that we are considering Goodman's entitlement to a separate rate in that review." *Id.*  Third, Commerce determined that "Goodman remains part of the PRC-wide entity, and the PRC-wide entity cash deposit rate is the appropriate cash deposit rate for Goodman." *Id*.  As a consequence, imports of

Goodman's subject merchandise have been subjected to a cash deposit requirement at the

PRC-wide rate of $4.71/kg. *Rescission*, 79 Fed. Reg. at 22,099.

In using the term "separate rate," Commerce referred to a rate to be applied to exporters

and producers that did not receive an individually-determined rate but qualified for a rate

separate from the "PRC-wide" rate, which is the rate Commerce assigned to the exporters and

producers failing to establish independence from the government of the PRC.

<u>4.  Goodman's Challenge to the Rescission of the New Shipper Review in the Court of International Trade</u>

Goodman brought this action on April 21, 2014.  Summons, ECF No. 1; Compl.,

ECF No. 6.  On May 21, 2014, the court granted a motion filed by the Fresh Garlic Producers

Association and its individual members, Christopher Ranch, L.L.C., The Garlic Company,

Valley Garlic, and Vessey and Company, Inc., to intervene on behalf of defendant.  Consent

Mot. to Intervene, ECF No. 8; Order, ECF No. 12.  Defendant-intervenors are domestic garlic

producers that participated in the new shipper review.  *See* Consent Mot. to Intervene 2, ECF

No. 8.

Goodman moved for judgment on the agency record pursuant to USCIT Rule 56.2 on

August 22, 2014.  Mot. of Pl. Shijiazhuang Goodman Trading Co, Ltd. for J. on the Agency R.,

ECF No. 22 ("Pl.'s Mot."); Mem. in Supp. of Pl.'s Mot. for J. on the Agency R., ECF No. 22

("Pl.'s Br.").  Defendant and defendant-intervenor filed briefs in opposition to plaintiff's motion

and plaintiff filed a reply.  Def.'s Mem. in Opp'n to Pl.'s R. 56.2 Mot. for J. Upon the Agency

Record (Nov. 6, 2014), ECF No. 31 ("Def.'s Opp'n"); Def.-intervenors' Resp. in Opp'n to Pl.'s

Mot. for J. on the Agency R. (Nov. 6, 2014), ECF No. 33 ("Def.-intervenor's Opp'n"); Pl.'s

Reply to the Responses of Def. & Def.-intervenors to Pl.'s R. 56.2 Mot. for J. upon the Agency

R. (Dec. 10, 2014), ECF No. 37 ("Pl.'s Reply").  The court held oral argument on May 21, 2015.

ECF No. 43.

5.  The Eighteenth Administrative Review of the Antidumping Duty Order

The period of review for the requested new shipper review, November 1, 2011 through

October 31, 2012, corresponds to the period of review for the eighteenth periodic administrative

review of the Order, the final results of which Commerce issued on June 30, 2014, 70 days after

the Rescission contested in this case.  *Fresh Garlic from the People's Republic of China: Final*

*Results and Partial Rescission of the 18th Antidumping Duty Administrative Review; 2011-2012*,

79 Fed. Reg. 36,721 (Int'l Trade Admin. June 30, 2014) ("*Final Results*").

After stating in the Rescission that "we are considering Goodman's entitlement to a

separate rate in that review," *Final Decision Mem.* 9, Commerce, in the final results of the

eighteenth administrative review, rescinded the eighteenth administrative review as to Goodman

on the same ground on which it ruled in the Rescission, *Final Results*, 79 Fed. Reg. at 36,723

("Because the sales subject to this review are the same sales found to be non-*bona fide* in the

new shipper review, the Department is rescinding this administrative review with respect to

Goodman.").

In the eighteenth review, Commerce retained the PRC-wide rate of $4.71 per kg., the rate

it continued to apply to Goodman, and determined a rate of $1.82 per kg. for the separate rate

respondents in that review.  *Id.*  Before this Court, numerous parties, including Goodman,

contested the final results of the eighteenth review; that litigation is ongoing.  *See Fresh Garlic*

*Producers Ass'n v. United States*, 39 CIT __, Slip Op. 15-133 (Nov. 30, 2015) ("*Fresh Garlic*

*Producers*").

## II. DISCUSSION

### A.  Jurisdiction and Standard of Review

The court exercises jurisdiction according to section 201 of the Customs Courts Act of 1980, 28 U.S.C. § 1581(c), under which the court may review actions contesting the final results of an administrative review of an antidumping duty order brought under section 516A of the Tariff Act of 1930 ("Tariff Act"), 19 U.S.C. § 1516a(a)(2)(B)(iii).  The court is required to hold unlawful any finding, conclusion, or determination that is not supported by substantial evidence on the record or that is otherwise not in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. Nat'l Labor Relations Board*, 305 U.S. 197, 229 (1938).

### B.  Goodman's Claim and Supporting Grounds

Goodman claims that the decision Commerce reached in the Rescission was contrary to law in several respects.  It argues, first, that the Department's rescinding the new shipper review was contrary to law because substantial record evidence does not support the determination that the sales upon which the new shipper review request was based were not *bona fide* sales. Pl.'s Br. 20-38, 51.  Second, Goodman argues that, even if that determination had been lawful, Commerce still would have acted unlawfully in subjecting Goodman's exports to the PRC-wide rate of $4.71 per kg., an "adverse facts available" ("AFA") rate reserved by statute for uncooperative respondents.  *Id.* at 38-40, 51-52.  In support of this argument, Goodman asserts that it "fully cooperated with Commerce and established it was independent of Chinese government control" and that "[t]here was no evidence to the contrary."  *Id.* at 51.  Third, Goodman argues that the $4.71/kg. PRC-wide rate, which dates back to 1994 and corresponded

to an ad valorem rate of 376.67% when it was converted to a specific duty in 2009, is outdated

by more than 20 years, imposed according to a previous version of the antidumping law,

grounded neither in commercial reality nor in record evidence, and unlawfully punitive.  *Id.* at

40-50.

<u>C.  The Department Must Reconsider its Decision to Reject Goodman's Sales</u>

As a general matter, Commerce is required by Section 751(a) of the Tariff Act of 1930

(the "Act") to conduct, "at least once during each 12-month period beginning on the anniversary

date of publication" of an antidumping duty order, a review of the order "if a request for such a

review has been received."  19 U.S.C. § 1675(a)(1).  In that review, Commerce is required to

determine "the normal value and export price (or constructed export price) of each entry of the

subject merchandise" and "the dumping margin for each such entry."  *Id.* § 1675(a)(2).

In § 1675(a)(2)(B)(i), the statute requires, further, that Commerce conduct an

administrative review upon the request of an exporter or producer of merchandise subject to an

antidumping duty order who did not export subject merchandise to the United States during the

period of the investigation resulting in that order and who is not affiliated with an exporter or

producer who exported subject merchandise during that period.  The purpose of the

Department's conducting such a "new shipper" review, or "NSR," is "to establish an individual

weighted average dumping margin . . . for such exporter or producer."  *Id.*[2]

---

[2] 19 U.S.C. § 1675(a)(2)(B) provides, in pertinent part, as follows:

(B) Determination of antidumping . . . duties for new exporters and producers
    (i) In general
    If the administering authority [Commerce] receives a request from an exporter or
    producer of the subject merchandise establishing that--
(continued . . .)

It is undisputed that the two express requirements of § 1675(a)(2)(B)(i), i.e., that the

exporter/producer not have exported subject merchandise to the United States during the period

of investigation and not be affiliated with a party who did, have been satisfied in this case.  In its

notice initiating the new shipper review, Commerce found "that Goodman's request meets the

threshold requirements for initiation of an NSR."  *Initiation*, 78 Fed. Reg. at 89.  The notice

informed the public that Goodman and the producer of the garlic exported by Goodman each had

certified that (1) it did not export fresh garlic for sale to the United States during the period of

investigation; and (2) since initiation of the investigation it had not been affiliated with any

exporter or producer who did so.  *Id*.  Throughout the new shipper review, Commerce did not

reach any findings contradicting these certifications.

In its regulations, Commerce imposes a third requirement for initiation of a new shipper

review: the exporter or producer must have "exported, or sold for export, subject merchandise to

the United States."  19 C.F.R. § 351.214(b)(1).  Commerce determined that Goodman met this

requirement as well.  In the initiation notice, Commerce stated that "Goodman submitted

documentation establishing the following: (1) The date on which fresh garlic was first entered;

(2) the volume of that and subsequent shipments; and (3) the date of the first sale to an

unaffiliated customer in the United States."  *Initiation*, 78 Fed. Reg. at 89.  Commerce added that

it had "queried the database of U.S. Customs and Border Protection (CBP) in an attempt to

---

(. . . continued)
   (I) such exporter or producer did not export the merchandise that was the subject
   of an antidumping duty . . . order to the United States  . . . during the period of
   investigation, and
   (II) such exporter or producer is not affiliated (within the meaning of
   section 1677(33) of this title) with any exporter or producer who exported the
   subject merchandise to the United States . . . during that period, the administering
   authority shall conduct a review under this subsection to establish an individual
   weighted average dumping margin . . . for such exporter or producer.

confirm that shipments reported by Goodman had entered the United States for consumption and

that liquidation had been properly suspended for antidumping duties" and that this examined

information "was consistent with that provided by Goodman in its request." *Id.* (footnote

omitted).  Commerce treated Goodman's information on exports of subject merchandise as

sufficient, at least, to "meet[ ] the threshold requirements for initiation of an NSR." *Id.*

    The regulations apply an additional requirement where there is, as here, an "antidumping

proceeding involving imports from a nonmarket economy country." 19 C.F.R.

§ 351.214(b)(2)(iii)(B).  In such a proceeding, the exporter or producer must provide "a

certification that the export activities of such exporter or producer are not controlled by the

central government." *Id.*  The initiation notice announced that Commerce would "issue a

questionnaire to Goodman that includes a separate rate section" and that the new shipper review

"will proceed if the response provides sufficient indication that the exporter and producer are not

subject to either *de jure* or *de facto* government control with respect to their export of fresh

garlic." *Initiation*, 78 Fed. Reg. at 89.  Here also, Commerce found that Goodman met the

regulatory requirement.  For the Preliminary Results, Commerce preliminarily found that

Goodman qualified for a separate rate based on its *de jure* and *de facto* independence from

control of the government of the PRC, *Prelim. Decision Mem.* 5, a finding Commerce did not

rescind or alter in the remainder of the new shipper review.

    The Commerce regulations further provide, however, that "[t]he Secretary may rescind a

new shipper review" if Commerce concludes that two conditions have been met.  19 C.F.R.

§ 351.214(f)(2).  Of the two conditions, the one at issue in this case is that "there has not been an

entry and sale to an unaffiliated customer in the United States of subject merchandise." *Id.*

§ 351.214(f)(2)(i).[3]  It is not contested that entries of subject merchandise exported by Goodman

occurred during the POR and that the subject merchandise involved three transactions between

Goodman and an unrelated U.S. customer.  Goodman claims, essentially, that Commerce

unlawfully rescinded the new shipper review according to a finding that these transactions did

not qualify as "sales" within the meaning of § 351.214(f)(2)(i).

In applying § 351.214(f)(2)(i) in this and other new shipper review proceedings,

Commerce has considered whether a reported sale is "commercially reasonable, and therefore

*bona fide.*"  *Prelim. Decision Mem.* 3.  For the Preliminary Results, Commerce stated that it

"considers, *inter alia*, such factors as: (1) the timing of the sale; (2) the price and quantity; (3) the

expenses arising from the transaction; (4) whether the goods were resold at a profit; and

(5) whether the transaction was made on an arm's-length basis."  *Id.* (footnote omitted).  *See also*

*Bona Fide Nature of the Sales in the Antidumping Duty New Shipper Review of Fresh Garlic*

*from the People's Republic of China (PRC): Shijiazhuang Goodman Trading Co., Ltd.* 2

(Nov. 4, 2013), ECF No. 24-2 (footnotes omitted) ("*Bona Fide Analysis Mem.*").

Four entries of merchandise exported by Goodman occurred during the POR, in July,

September, and October of 2012, stemming from Goodman's three sales of subject merchandise

for export to the United States.[4]  *See Request* 1-2; Pl.'s Br. 9.  Certain facts pertaining to the

---

[3] The second condition is that "[a]n expansion of the normal period of review to include
an entry and sale to an unaffiliated customer in the United States of subject merchandise would
be likely to prevent the completion of the review within the time limits set forth in paragraph (i)
of this section." 19 C.F.R. § 351.214(f)(2)(ii).  Goodman's claim does not involve this second
condition.

[4] The garlic that was the subject of Goodman's third sale resulted in two entries into the
United States; each of the first two sales was associated with a single entry.  *See Request for New
Shipper Review* 1, App. 6.

three sales are not at issue in this litigation.  All three sales were of garlic produced by Jinxiang

Zhongtian Business Co., Ltd., a Chinese garlic producer unrelated to Goodman, and were made

to the same buyer in the United States.  *See Bona Fide Analysis Mem.* 3.  The U.S. buyer, which

was the importer on the four entries associated with the three sales, was an established reseller of

garlic as well as other products.  Pl.'s Br. 18.  The buyer and Goodman, who are not related

parties, had a business relationship preceding the POR of the new shipper review, the buyer

previously having purchased from Goodman subject garlic and another food product.  *Bona Fide*

*Analysis Mem.* 3.  Commerce found, specifically, that the business relationship between

Goodman and the buyer began in November 2010 and that the two parties had "met in Canton at

a trade fair." *Id.*

In the Preliminary Results, Commerce preliminarily determined that Goodman's sales

were *bona fide*.  *See Prelim. Results*, 78 Fed. Reg. at 67,112.  Commerce concluded that each of

its five factors supported a finding that the sales were *bona fide*, as follows:

> The Department preliminarily finds that the sale of subject merchandise made by
> Goodman was made on a *bona fide* basis.  Specifically, the Department
> preliminarily finds that: (1) the timing of the sale by itself does not indicate that
> the sale might not be *bona fide*; (2) record evidence indicates that the prices and
> quantities of the sales are commercially reasonable and not atypical of normal
> business practices of fresh garlic exporters; (3) Goodman did not incur any
> extraordinary expenses arising from the transaction; (4) the goods were resold by
> Goodman's unaffiliated U.S. customer for a profit; and (5) the new shipper sales
> were made between Goodman and its unaffiliated U.S. customer at arm's length.
> Therefore, the Department has preliminarily found that Goodman's sales of
> subject merchandise to the United States were *bona fide* for the purposes of this
> NSR.

*Prelim. Decision Mem.* 3 (footnote omitted).

In the Rescission, Commerce reversed its earlier determination, stating that "[d]ue to the

totality of the circumstances, including price, quantity, and concerns regarding the relationship

with another garlic exporter located in the PRC, as detailed in the Goodman Final Analysis

Memorandum, the Department finds that Goodman's sales are not *bona fide*." *Rescission*,

79 Fed. Reg. at 22,098 (citing *New Shipper Review of the Antidumping Duty Order on Fresh*

*Garlic from the People's Republic of China: Final Analysis of Shijiazhuang Goodman Trading*

*Co., Ltd.* (Apr. 3, 2014) ("*Final Analysis Mem.*")).  In the Decision Memorandum, Commerce

described the test it applied in reaching its determination that Goodman's sales were not *bona*

*fide.*  Commerce stated that it "employs a totality of the circumstances test" under which it

"looks to whether the transaction is 'commercially unreasonable' or 'atypical of normal business

practices.'" *Final Decision Mem.* 4 (footnote omitted).

　　　In support of its conclusion that none of Goodman's sales was *bona fide*, Commerce

found that the sales were "not reflective of normal business practices" and not "indicative of

future selling practices." *Id.*  Specifically, Commerce reversed its earlier finding that "record

evidence indicates that the prices and quantities of the sales are commercially reasonable and not

atypical of normal business practices of fresh garlic exporters." *Prelim. Decision Mem.* 3.  In the

Final Decision Memorandum, Commerce stated that "we find the average unit value and the

quantity of Goodman's sales to be atypical and, thus, commercially unreasonable," adding that

"[i]n particular, we find that Goodman's entry prices to be [*sic*] exceptionally high in comparison

to other entries of garlic during the POR." *Final Decision Mem.* 4.  Further, Commerce stated

that "we find that its entry quantities to be [*sic*] lower than the most other [*sic*] POR entries of

garlic during the POR." *Id.*  Referring to its analysis of price and quantity, Commerce stated in

the Final Analysis Memorandum that "[o]n this basis, we find that the price and quantity of

Goodman's new shipper entries are aberrational and are therefore, indicate that [*sic*] the sales

were not *bona fide*." *Final Analysis Mem.* 8.

Concerning the four factors in its five-factor test other than the "prices and quantities"

factor, Commerce stated in the Final Analysis Memorandum that "we adhere to our preliminary

results." *Id.* at 9.  In the Preliminary Results, Commerce had found that the timing of the sales,

by itself, did not indicate that the sales were not *bona fide* and that there were no extraordinary

expenses.  *Bona Fide Analysis Mem.* 4, 6.  For the Preliminary Results, Commerce also found

that "[a]ll information indicates that the transactions were on an arm's length basis" and that

"[n]o information on the record supports a conclusion otherwise." *Id.* at 7.  In the Final Analysis

Memorandum, Commerce stated that "it was unclear whether the U.S. customer resold the garlic

at a profit." *Final Analysis Mem.* 9.  Commerce had reached inconsistent conclusions in the

preliminary phase of the new shipper review, finding on November 4, 2013 that it was unclear

whether the resales were made at a profit, *Bona Fide Analysis Mem.* 7, and also finding, in a

document issued the same date, that the goods were resold at a profit, *Prelim. Decision Mem.* 3.[5]

Commerce offered one additional reason in support of its conclusion that Goodman's

sales were not *bona fide*.  Commerce stated in the Final Analysis Memorandum that it "inferred"

that a person employed by Goodman during the POR, whom Commerce identified as "Ms. Gao,"

conducted activities on behalf of Goodman "in making the relevant shipments to the United

States . . . " that were not conducted solely, if at all, in "Goodman's interests."  *Final Analysis*

*Mem.* 8.

---

[5] Plaintiff argues there is record evidence that the importer sold all of Goodman's garlic at a profit.  *See* Pl.'s Br. 21.  However, the chart showing the resale prices of Goodman's importer that plaintiff attached to its brief in support of this argument differs from the chart Goodman submitted as an exhibit to its 4th Supplemental Questionnaire Response.  *Compare* Pl.'s Br. App. 18, *with Goodman's 4th Supplemental Questionnaire Response dated September 30, 2013* at Ex. 3 (Sept. 30, 2013), ECF No. 24-9.  The chart Goodman placed on the record during the administrative proceeding lacks units for price and quantity and thus does not permit derivation of a per-kilogram unit price for each of the importer's sales.

During the administrative proceeding, defendant-intervenors argued that Goodman did

not qualify as a new shipper, alleging an affiliation between Goodman and Hebei Golden Bird

Trading Co., Ltd. ("Golden Bird"), a mandatory respondent that was a party to prior

administrative reviews, through a common sales person, Ms. Gao.  *See id.* at 1.  The Department

found that there was "insufficient information on the record to find that Goodman and Golden

Bird are affiliated."  *Id.* at 4.  The Department also found that "there is inconclusive evidence

that Ms. Gao was employed during the POR of this review by Golden Bird," when she was

employed by Goodman, and that "[e]ven if the Department were to find that Ms. Gao was

employed by Golden Bird during the relevant time period, there is nothing on the record

indicating that she exercised any control over Golden Bird" within the meaning of

section 771(33)(F) of the Tariff Act, 19 U.S.C. § 1677(33)(F)[6] and 19 C.F.R. § 351.102(b)(3).[7]

*Id.*  Nevertheless, Commerce concluded in the Decision Memorandum that "the Department has

---

[6] 19 U.S.C. § 1677(33)(F) provides as follows: "[T]he following persons shall be considered to be "affiliated" or "affiliated persons": . . Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person."

[7] 19 C.F.R. § 351.102(b)(3) provides as follows:

Affiliated persons; affiliated parties. "Affiliated persons" and "affiliated parties" have the same meaning as in section 771(33) of the Act.  In determining whether control over another person exists, within the meaning of section 771(33) of the Act, the Secretary will consider the following factors, among others: Corporate or family groupings; franchise or joint venture agreements; debt financing; and close supplier relationships.  The Secretary will not find that control exists on the basis of these factors unless the relationship has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise or foreign like product.  The Secretary will consider the temporal aspect of a relationship in determining whether control exists; normally, temporary circumstances will not suffice as evidence of control.

concerns with regards to the reliability of responses provide [*sic*] by Goodman with regards to

Ms. Gao's employment at Golden Bird." *Final Decision Mem.* 4.

<u>1.  The Department's Authority to Rescind a New Shipper Review upon Rejecting Sales
Transactions Is Limited to Exceptional Circumstances</u>

The regulation by which Commerce rescinded the new shipper review makes no mention

of a "*bona fide*" requirement.  In pertinent part, the regulation provides simply that Commerce

may rescind a review if "there has not been an entry and sale to an unaffiliated customer in the

United States of subject merchandise."  19 C.F.R. § 351.214(f)(2)(i).  In effect, Commerce

interprets the term "sale" in § 351.214(f)(2)(i) to mean that a transaction it determines not to be a

*bona fide* sale is, for purposes of the regulation, not a sale at all.

This Court has upheld the Department's applying the *bona fide* test in the context of a

new shipper review but in doing so has cautioned that "Commerce's authority to exclude sales as

not *bona fide* is limited to 'exceptional circumstances when those sales are unrepresentative and

extremely distortive.'"  *Hebei New Donghua Amino Acid Co., Ltd. v. United States*, 29 CIT 603,

610, 374 F. Supp. 2d 1333, 1339 (2005) (quoting *Am. Silicon Techs. v. United States*,

24 CIT 612, 616, 110 F. Supp. 2d 992, 995 (2000) (in turn quoting *FAG U.K. Ltd. v. United

States*, 20 CIT 1277, 1281-82, 945 F. Supp. 260, 265 (1996))).  The statement in *Hebei New

Donghua Amino Acid* finding an implied "exceptional circumstances" limitation on the

Department's authority is well founded.  The regulation itself, by stating without qualification

that rescission requires an absence of a "sale," implies such a limitation.  Further support is

found in the statutory directive that Commerce conduct a review of an exporter that did not

export subject merchandise during the period of investigation, and was not affiliated with an

exporter or producer that did, for the purpose of establishing an individual weighted average

dumping margin.  *See* 19 U.S.C. § 1675(a)(2)(B)(i).  In order to calculate an individual dumping

margin for an exporter or producer, there must be a sale by which such a margin may be

calculated, but where a sale of subject merchandise for export actually has occurred, the plain

meaning of the statute and the regulation support the conclusion that the Department's rejection

of that sale must be the exception, not the ordinary circumstance.

> ## 2.  In Finding that Goodman's Sales Prices Were "Aberrational" and Not "Commercially Reasonable," Commerce Did Not Analyze All Relevant Record Evidence

Goodman does not challenge the Department's authority to impose its *bona fide* test

when considering whether there has been a sale.  Instead, it argues that Commerce, in applying

that test and rescinding the review, reached a decision that is unsupported by substantial

evidence on the administrative record and otherwise not in accordance with law.  Pl.'s Br. 20-22,

24-38.

A court reviewing an agency's factual determination must consider whether that

determination is based upon the record evidence considered as a whole.  *Universal Camera

Corp. v. Nat'l Labor Rev. Bd.*, 340 U.S. 474, 488 (1951) ("The substantiality of evidence must

take into account whatever in the record fairly detracts from its weight."); *Sango Int'l, L.P. v.

United States*, 484 F.3d 1371, 1378 (Fed. Cir. 2007) ("The substantial evidence inquiry takes

into account both the evidence that supports and detracts from the conclusion reached.") (*citing

Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1352 (Fed. Cir. 2006)).  In deciding whether

to disqualify Goodman's transactions from serving as "sales" within the meaning of

§ 351.214(f)(2)(i), Commerce was required to consider the evidence on the record as a whole,

including record evidence that fairly detracted from its conclusion.  In this case, some of the

record evidence did not support a finding that Goodman's transactions were "exceptional" or

commercially unreasonable.  Instead, this evidence detracted from such a finding by indicating

that the transactions occurred under ordinary commercial circumstances.  Because the analysis

presented in the Rescission and the incorporated decision documents does not address all of this

evidence, the court cannot conclude that Commerce based its ultimate decision to rescind the

review on the record considered as a whole.  Moreover, as discussed later in this Opinion and

Order, one of the findings upon which Commerce reached that ultimate decision is not supported

by substantial evidence on that record.

Commerce found that the prices at which Goodman sold subject merchandise during the

POR were "aberrational" and not "commercially reasonable" by comparing the average unit

values ("AUV") of the subject merchandise on Goodman's four entries, and a single weighted

AUV calculated from these values, with a weighted average unit value obtained from Customs

and Border Protection ("Customs") data on U.S. imports of garlic from China for the one-year

POR.  *Final Analysis Mem.* 7.  Commerce found that individual AUVs of the merchandise on

Goodman's four entries and the weighted AUV derived from these entry data were "significantly

higher" than the one-year AUV derived from the Customs data and that this fact "indicates that

these entries were not typical of the sales Goodman will make in the future."  *Id.* (footnote

omitted).[8]  In basing its findings solely on a simple comparison of Goodman's prices with the

one-year AUV from the Customs data, Commerce failed to analyze certain record data that were

relevant to, and indeed probative of, the issue of whether Goodman's prices were aberrational or

commercially unreasonable.

---

[8] Commerce reported that "[t]he average unit value (AUV) for Goodman's four entries during the POR were $2.67/kg., $2.83/kg., $2.83/kg., and $3.16/kg." and that "[t]he AUV for all whole garlic entries during the POR was $1.58/kg.[ ], whereas the weighted AUV of Goodman's four entries during the POR was $2.85/kg." *Final Analysis Mem.* 7 (brackets enclosing public information omitted).

The Department's analysis, for example, does not address the record data showing the prices at which Goodman purchased the subject garlic from the unrelated Chinese producer. These purchase prices are not comparable to the general AUV Commerce obtained from the Customs data.[9] Further, these purchase prices, when compared to Goodman's resale prices, would not support a finding that Goodman's three sales during the POR—which Commerce itself found to have been made at arm's length—were extraordinary, rather than ordinary, commercial resale transactions.[10]

In basing its comparison solely on a POR-wide average unit value for all imports of whole garlic from China, Commerce also failed to analyze record data showing that a significant increase in garlic prices occurred during the POR. The Customs import data upon which Commerce relied in finding that Goodman's garlic prices were aberrational also show that the AUV of garlic imports from China was markedly higher during the last eight months of the period of review than it had been during the first four months of that twelve-month period and that the AUV in the last five months, when Goodman's sales and entries occurred, remained at that higher level.[11] *See Petitioners' Comments on Goodman's Second Supplemental*

---

[9] Record data show that the weighted average unit value for Goodman's purchases of the garlic from the unrelated producer was $2.52/kg., or nearly a dollar per kilogram higher than the AUV for all Chinese whole garlic imports during the POR. *See Goodman's Supplemental Questionnaire Response dated May 27, 2013 at Ex. 7, "Copies of Purchase Contract between Goodman and Zhongtian"; Goodman's Rebuttal Case Brief dated January 21, 2014 at App. 1* (Jan. 21, 2014) (Admin.R.Doc. No. 187).

[10] The data show a weighted-average mark-up of $0.33/kg. ($2.85-$2.52), or 13%. *See Goodman's Rebuttal Case Brief dated January 21, 2014 at App. 1 (Jan. 21, 2014)* (Admin.R.Doc. No. 187); *Goodman's Case Brief dated January 13, 2014 at Apps. 1 & 2* (Jan. 13, 2014) (Admin.R.Doc. No. 184).

[11] The AUV shown in the Customs data for June 2012, the month of Goodman's first of three sales, was $2.06/kg. Goodman's per-kilogram prices on that sale, by bulb size, were $2.20 (continued . . .)

*Questionnaire, dated August 19, 2013* at Attach. 2 (Aug. 19, 2013) (Admin.R.Doc. No. 128).

The record also shows that Goodman explained to Commerce during the administrative

proceeding that it had renegotiated one of its contracts in response to the market trend.  *See* Pl.'s

Br. 14 ("Due to changes in the market situation in China and noted in the Supplementary

Contract, the parties agreed to changes in prices and sizes."); *see also id.* at 17-18 (citing

*Goodman's 3rd Supplemental Questionnaire Response, dated August 29, 2013* at Attachs. 2-3

(Aug. 29, 2013) (Admin.R.Doc. No. 52)).   In concluding that Goodman's prices were

"aberrational" compared to the AUV for the entire POR, and therefore commercially

unreasonable, without considering the AUV prevailing at the time of sale, Commerce failed to

consider a commercially significant aspect of the comparison it was attempting to make.[12]

---

(. . . continued)
for 5.5 cm garlic, $2.57 for 6 cm garlic, and $2.86 for 6.5 cm garlic.  For August 2012, the month of Goodman's second sale, the Customs AUV was $2.17/kg.  Goodman's per-kilogram prices on that sale, by bulb size, were $1.91 for 5 cm garlic and $2.72 for 6 cm garlic.  For September 2012, the month of the third sale, the Customs AUV was $2.09/kg.  Goodman's per-kilogram prices on the third sale, by bulb size, were $2.86 for 6.5 cm garlic and $3.16 for 7 cm garlic.  *See Goodman's Rebuttal Case Brief dated January 21, 2014* at App. 1 (Jan. 21, 2014) (Admin.R.Doc. No. 187); *Goodman's Case Brief dated January 13, 2014* at App. 1 (Jan. 13, 2014) (Admin.R.Doc. No. 184); Pl.'s Br. App. 20A, *U.S. Import Statistics Showing Quantity and Value of Garlic Imports from China in HTS Category 0730.20 During 2011 and 2012* (Aug. 27, 2014), ECF No. 24-12.

[12] Defendant and defendant-intervenor argue that the court should refuse, on grounds of failure to exhaust administrative remedies, to hear Goodman's argument that garlic prices fluctuated during the POR, contending that Goodman failed to raise this argument during the new shipper review.  Def.'s Opp'n 15-16; Def.-intervenor's Opp'n 24-25.  The court rejects this argument.  Given the Department's preliminary finding that Goodman's prices were not aberrational, the court will not require Goodman to have anticipated every possible ground by which the Department might reverse its decision as to the *bona fides* of its sales.  Moreover, the court notes that Goodman referenced fluctuating prices in the Chinese garlic market in its questionnaire responses in the context of the two contracts it renegotiated due to rising garlic prices.  *See Goodman's 3rd Supplemental Questionnaire Response dated August 29, 2013* at Attach. 3 (Aug. 29, 2013) (Admin.R.Doc. No. 52) ("As with agricultural products generally, prices fluctuate."); *see also Petitioners' Comments on Goodman's Second Supplemental* (continued . . .)

Commerce also did not address an apparent anomaly presented by Customs entry data that itself appears to involve aberrational values for garlic.  The data in question are reported for one of the exporters and appear to have distorted the weighted average unit value derived from those data.[13]

Finally, Commerce did not address the possibility that its comparison of Goodman's prices with the weighted average unit value from the Customs data could have been affected by price variation due to bulb size.[14]  The record evidence shows that almost all of Goodman's POR sales consisted of garlic with a bulb size of 6.0-7.0 cm. in diameter.  *See* Pl.'s Br. 14-16; *Goodman's Supplemental Questionnaire Response dated May 27, 2013* at Ex. 7, *"Copies of Purchase Contract between Goodman and Zhongtian"* (May 27, 2013) (Admin.R.Doc. No. 55).  The record does not contain information indicating what bulb sizes characterized the sales in the Customs data, so it cannot be presumed that the Customs data, in that respect, are a good

---

(. . . continued)
*Questionnaire dated August 19, 2013* at Attach. 2 (Aug. 19, 2013) (Admin.R.Doc. No. 128) (submitting Customs data on the record showing trends in AUV of U.S. imports of garlic from China during the period of review).

[13] The AUV shown in the Customs data for imports of garlic exported by [
                                                                          ], which is approximately [
    ] of the weighted-average unit value for all POR exports of Chinese garlic.  Pl.'s Br. App. 19, *Charts Showing the CBP Database Exporter* (Aug. 27, 2014), ECF No. 24-11.  The values for this exporter are shown as ranging from [                    ]  *Id.*  Excluding these data from the AUV for all POR exports from China would result in an increase in the general weighted-average unit value from $1.58/kg. to [           ]  *Id.*

[14] Commerce recognized that "specificity is of particular importance when selecting a surrogate value for raw garlic bulb inputs" and that "[d]uring the course of past reviews, the Department has concluded that size and quality have significant influence on the value of the raw garlic bulb inputs."  *New Shipper Review of the Antidumping Duty Order on Fresh Garlic from the People's Republic of China: Surrogate Values for the Preliminary Results*, A-570-831, ARP11-12, at 4 (Nov. 1, 2013) (Admin.R.Doc. No. 143) (footnote omitted); *see also* Pl.'s Br. 29.

comparison with Goodman's price data.  The record, however, does contain evidence that Goodman's garlic was viewed in the marketplace as being of relatively large bulb size.[15]  The record also contains data showing that, on the three sales during the POR, Goodman's prices for garlic in the 6 and 7 cm. sizes were significantly higher than its prices for other garlic sizes.  *See Goodman's Rebuttal Case Brief dated January 21, 2014* at App. 1 (Jan. 21, 2014) (Admin.R.Doc. No. 187); *Goodman's Case Brief dated January 13, 2014* at App. 1 (Jan. 13, 2014) (Admin.R.Doc. No. 184).  Goodman's purchase prices also showed that the per-kilogram prices increased with bulb size.  *See Goodman's Case Brief dated January 13, 2014* at App. 2 (Jan. 13, 2014) (Admin.R.Doc. No. 184).  Because bulb size is a merchandise characteristic shown by record data to be commercially important, it must inform any finding as to whether Goodman's sales were "aberrational" or not "commercially reasonable."

In conclusion, the analysis by which Commerce found that Goodman's prices were aberrational and not commercially reasonable failed to consider all relevant and probative record evidence.  When viewed in the context of the evidence viewed as a whole, the POR-wide weighted average unit value for all Chinese garlic exports upon which Commerce based its finding could provide only a superficial basis for comparison.

### 3.  The Finding that the Quantities of Goodman's Sales Were "Aberrational" Is Not Supported by Substantial Evidence on the Record

In rejecting Goodman's sales, Commerce cited the Customs import data on Chinese garlic entries showing that the average quantity on Goodman's entries during the POR was less than half the average quantity for all entries of Chinese garlic during the period of review, which

---

[15] Goodman's purchaser "wanted different specifications of fresh garlic, especially the large garlic bulbs, and required Goodman to ensure the quality." *Goodman's 4th Supplemental Questionnaire Response dated Sept. 30, 2013, Appendix IX – Importer Specific* 5 (Sept. 30, 2013) (Admin.R.Doc. No. 135).

it described as the "normal entry size." *Final Analysis Mem.* 7.  Commerce acknowledged that

"the quantity of a sale may not be sufficient, by itself, to warrant a finding that a transaction is

not *bona fide*," *id.* at 7, but nevertheless relied on its average quantity comparison to support its

rejection of the sales.

      Substantial evidence is not available on this record to support a finding that the quantities

of Goodman's sales were, in the Department's words, "aberrational" and not "commercially

reasonable."  The quantities on the four entries, while smaller than the average shown in the

Customs import data, cannot be described truthfully as commercially insignificant or

exceptional, whether considered individually or collectively.  *See* Pl.'s Br. App. 19, *Charts*

*Showing the CBP Database Exporter* (Aug. 27, 2014), ECF No. 24-11.  Nor were Goodman's

quantities "aberrational," as Commerce characterized them to be.  The Customs import data

shows that the aggregate quantity and value of Goodman's POR shipments were larger than

those of several other Chinese exporters.  Also, in judging the quantities on the individual entries

of Goodman's subject merchandise to be unacceptable because they are less than half of what

Commerce considered to be the "normal entry size," Commerce unfavorably compared

Goodman's quantities with a concept, i.e., "normal entry size," that it failed to ground in record

evidence.  For these reasons, the court must reject as unsupported by substantial evidence the

Department's finding that the quantities on entries of Goodman's merchandise during the POR

"are aberrational and are therefore [*sic*], indicate that the sales were not *bona fide*."  *Final*

*Analysis Mem.* 8.

    4.  The Department's Implied Findings and Inference as to Ms. Gao Cannot Be Sustained on
This Record

      Commerce "inferred" that "Ms. Gao's activities on behalf of Goodman in making the

relevant shipments to the United States . . . ." were not conducted solely, if at all, in "Goodman's

interests." *Final Analysis Mem.* 8.  Commerce also expressed in the Decision Memorandum that

"the Department has concerns with regards to the reliability of responses provide [*sic*] by

Goodman with regards to Ms. Gao's employment at Golden Bird."  *Final Decision Mem.* 4.

Commerce relied on its inference and "concern" in concluding that Goodman's sales were not

"commercially reasonable, and therefore *bona fide.*"  *Id.*  Goodman characterizes the

Department's reliance on Ms. Gao's role as "irrelevant," Pl.'s Br. iii, or "tangential," *id.* at 38, to

the issue of whether Goodman's sales were *bona fide*.

      To be sustained upon judicial review, a determination must be based on findings

supported by substantial record evidence.  Moreover, there must be reasoning by which a court

may ascertain the connection between the "facts found and the choice made."  *See Burlington*

*Truck Lines v. United States*, 371 U.S. 156, 168 (1962).  Commerce expressed what it

characterizes as an inference that Goodman's POR sales were not entirely, if at all, conducted in

Goodman's interest, but an inference is not a finding, and this particular inference is vague and

conclusory.  An agency may draw a reasonable inference so long as it is drawn from record

evidence or a finding based on record evidence, but this inference is drawn from neither.  The

Department's expressed "concern" about the reliability of Goodman's questionnaire responses is

also vague, and Commerce fails to link its concern to specific information Goodman provided

during the new shipper review that Commerce deems unreliable or that could be shown to be

relevant to the question of whether the prices and quantities in Goodman's sales were

aberrational.[16]

---

[16] Commerce based its inference and concern on certain conclusions it draws from
a noncompete agreement which the court is unable to find on the record of this proceeding.  The
concern and inference as to Ms. Gao are grounded in the subject matter of Goodman's response
to a question in a Commerce questionnaire.  *See Goodman's Supplemental Questionnaire*
(continued . . .)

### 5.  On Remand, Commerce Must Reconsider Its Rescission of the Review and Base a Redetermination on the Record as a Whole

To summarize the discussion above, Commerce rescinded the new shipper review because it found that the prices and quantities in the sales were not commercially reasonable and therefore not *bona fide* because they were aberrational, not reflective of normal business practices, and not indicative of future selling practices.  Also, Commerce inferred that Goodman's employee, Ms. Gao, did not act solely or at all in Goodman's interests and expressed concerns regarding Goodman's questionnaire responses regarding Ms. Gao's employment with Golden Bird.

The analysis by which Commerce found that the prices were not commercially reasonable did not address record evidence on the specifics of Goodman's purchase of the merchandise from its unrelated supplier and its sale of that same merchandise to its unrelated customer, on the increase in market prices during the latter months of the POR, on an apparent distortion caused by aberrational values for a specific exporter shown in the Customs data, and on the relationship of price to garlic bulb size.  The finding that the quantities were aberrational and commercially unreasonable lacks evidentiary support in the record.  Finally, the court cannot sustain the Department's analysis as to Ms. Gao.  Commerce made no express findings and stated only an inference and a concern with respect to the role of Ms. Gao in Goodman's sales and failed to link its inference and concern to specific information provided by Goodman.

Even though describing its result as based on a totality of the circumstances, Commerce has not based its ultimate decision to rescind the new shipper review on a consideration of the

---

(. . . continued)

*Response dated May 27, 2013* at Ex. 2 (May 27, 2013) (Admin.R.Doc. No. 53).  Commerce draws an inference from the documentation to which that questionnaire response refers.

record evidence as a whole.  Commerce itself found that Goodman's sales met three of the five

criteria in its *bona fides* test.  Specifically, Commerce found that the timing of the sales did not

indicate that the sales were not *bona fide* (although, as discussed above, it failed to consider

record evidence showing that the timing of the sales was important to a consideration of price).

It also found that Goodman's expenses on the three sales were not extraordinary, and, most

significantly, that all information indicated that the transactions were conducted on an arms-

length basis.  Certain other, uncontested, facts support a finding that the transactions between

Goodman and its U.S. customer were made in ordinary, rather than exceptional, commercial

circumstances but received little if any attention in the Department's analysis.  For example, the

record shows that the U.S. customer was an established reseller and that it previously had

purchased garlic, and another food product, from Goodman.[17]

In summary, the flaws the court has identified require it to order Commerce to reconsider

its decision to reject the sales Goodman made during the POR.  This reconsideration must be

based on a full and fair consideration of the relevant evidence on the record viewed as a whole.

D.  Commerce Gave Only an Invalid Reason for its Decision to Refuse to Assign Goodman a
Rate that Was Not Based on an Adverse Inference

In the Rescission, Commerce did not assign Goodman a "separate rate," i.e., an "all

others" rate that it assigns to respondents that have demonstrating independence from the

government of the PRC but that do not qualify for an individually-determined rate.  Challenging

this decision, Goodman argues before the court that the $4.71 per kilogram PRC-wide rate was

selected as the "adverse inference rate" that is authorized in the antidumping law only if the party

affected by it failed to cooperate by not acting to the best of its ability.  Pl.'s Br. 39 (citing

---

[17] *See Goodman's 4ᵗʰ Supplemental Questionnaire Response dated Sept. 30, 2013, Appendix IX – Importer Specific* 5 (Sept. 30, 2013) (Admin.R.Doc. No. 135).

19 U.S.C. § 1677e(b)).  Goodman submits that Commerce "failed to establish on the record that

Goodman met the adverse inferences conditions."  *Id.* at 40.  In subjecting Goodman to the PRC-

wide rate, Commerce made no finding under 19 U.S.C. § 1677e(b) that Goodman failed to

cooperate in responding to its requests for information.

Commerce gave four reasons for its decision.  Commerce stated that "we are considering

Goodman's entitlement to a separate rate" in the eighteenth periodic review of the Order, *Final

Decision Mem.* 9, for which the period of review is the same as the POR for the new shipper

review.  In deferring any decision on the issue, Commerce explained that it would "evaluate the

information placed on the record of the 18th administrative review to determine whether

Goodman is eligible for separate rate status in that segment of the proceeding."  *Id.* at 8.  Second,

Commerce reasoned that "[b]ecause we are rescinding this NSR, we are not further considering

whether Goodman is entitled to a separate rate, and this issue is moot."  *Id*.  Third, Commerce

pointed out that "Goodman has cited no case in which we rescinded an NSR and then granted a

separate rate to the company covered by the rescission."  *Id*.  Finally, Commerce reasoned that

upon its rescission of the new shipper review "Goodman remains part of the PRC-wide entity,

and the PRC-wide entity cash deposit rate is the appropriate cash deposit rate for Goodman."  *Id.*

at 9.

The court concludes that the Department's decision to subject Goodman to the PRC-wide

rate was arbitrary and capricious, and therefore contrary to law, because Commerce failed to

address the merits of the question before it.  Commerce provided no explanation that was

grounded in the antidumping statute, or in the administrative record of this proceeding, as to why

entries of Goodman's merchandise did not qualify under the antidumping law for a rate other

than the adverse-inference-based, PRC-wide rate of $4.71 per kg.  That record included a finding

that Goodman had demonstrated *de jure* and *de facto* independence from the government of the

PRC and lacked any finding that Goodman had failed to cooperate in responding to the

Department's inquiries during the new shipper review.  At the same time as it was deciding to

rescind the review, Commerce also concluded, in the Final Analysis Memorandum, that

"Goodman qualifies as a new shipper." *Final Analysis Mem.* 4.

      None of the reasons Commerce provided saves its decision from being arbitrary and

capricious.  The first reason given, that Commerce would consider the separate rate question in

the ongoing eighteenth periodic review, did not explain why the antidumping law allowed it to

defer its decision on a matter that was before it.  The second reason, that the separate rate issue

was moot, was plainly wrong.  The Department's resolution of that issue was the basis for the

Department's decision in the *Rescission* to subject entries of Goodman's merchandise to the

PRC-wide rate as a cash deposit rate, immediately upon publication of the Rescission.

*Rescission*, 79 Fed. Reg. at 22,099 ("Cash deposits will be required for exports of subject

merchandise by Goodman entered, or withdrawn from warehouse, for consumption on or after

the publication date at the per-unit PRC-wide rate, $4.71 per kilogram.").  The Department's

third reason, that Goodman had not cited any precedent in the Department's own past decisions,

was a *non sequitur* that avoided the issue.  The issue called for a decision based on the statute

and on the administrative record of this individual proceeding, and Commerce, on a premise it

grounded in its administrative practice, declined to provide one.  The Department's final reason,

that "Goodman remains part of the PRC-wide entity, and the PRC-wide entity cash deposit rate

is the appropriate cash deposit rate for Goodman," is entirely conclusory.  It also begs the

question as to how Goodman can remain part of the PRC-wide entity even though Commerce

determined that Goodman, in establishing that it qualified as a new shipper, demonstrated its

independence from the government of the PRC.

Defendant United States ("defendant") and defendant-intervenor provide rationales for

the Department's applying the PRC-wide rate that go beyond that which Commerce put forth.

Def.'s Opp'n 20-21; Def.-intervenor's Opp'n 31-34.   These rationales, therefore, are *post-hoc*

rationalizations rather than reasoning the Department offered.   The court must judge a decision

according to the reasoning the agency put forth.   *See Burlington Truck Lines*, 371 U.S. at 168-69.

Moreover, even were defendant's rationale before the court, the court would find it

unconvincing.   Defendant fails to explain why the PRC-wide rate is in accord with the statute

when considered on the specific record of this case, which includes a finding that Goodman was

independent of government control and lacks a finding of non-cooperation.   Defendant argues

that "Commerce did the only thing that it reasonably could" in rescinding the review in the

absence of "a commercially viable sale" and proceeds to conclude, without an analysis of the

record facts and the statutory provisions involved, that "[t]he rescission of the review resulted in

Goodman['s] remaining part of the China-wide entity."   Def.'s Opp'n 20-21.   Defendant adds

that "the China-wide entity was not under review in this proceeding."   *Id.* at 21.   This was a point

Commerce also made, *Final Decision Mem.* 9, without explaining why this limitation on the

scope of the new shipper review justified its decision.

Defendant-intervenors' proffered rationale essentially parallels defendant's.

Def.-intervenor's Opp'n 28-31.   Defendant-intervenors make the additional point that "[b]ecause

the Department concluded that Goodman had not completed a *bona fide* transaction during the

new shipper review's POR, the agency did not evaluate whether Goodman operates

independently of the Chinese government (*i.e.*, whether there is an absence of *de jure* and *de*

*facto* government control over Goodman's export activities)." *Id.* at 30-31.  This argument

mischaracterizes the Department's decisions in this case.  Commerce expressly found that

Goodman qualified as a new shipper even as it was rescinding the review.  *Final Analysis*

*Mem.* 4.  Under its regulation, Commerce could not have so found without also finding that

Goodman had established independence from the government of China.  *See* 19 C.F.R.

§ 351.214(b)(2)(iii)(B).  Commerce made the required findings as to Goodman's *de jure* and *de*

*facto* independence from government control in the Preliminary Results, *Prelim. Decision*

*Mem.* 5, and did not alter these findings in the remainder of the new shipper review.  Defendant-

intervenors' argument fails to recognize that the Department's finding that Goodman's sales

were not *bona fide* had no factual relationship to its finding that Goodman operated its garlic

export business independently from the control of the government of China.

Additionally, the court notes that Commerce explained in the Preliminary Decision

Memorandum that its basis for imposing a "single antidumping duty rate" on all companies

within a nonmarket economy ("NME") country is a "rebuttable presumption that all companies

within" a nonmarket economy country "are subject to government control." *Preliminary*

*Decision Mem.* 4.  The Preliminary Decision Memorandum further explained that "[i]t is the

Department's policy to assign all exporters of subject merchandise in an NME country this single

rate unless an exporter can demonstrate that it is sufficiently independent so as to be entitled to a

separate rate." *Id.* (footnote omitted).  Commerce added that "[e]xporters can demonstrate this

independence through the absence of both *de jure* and *de facto* government control over export

activities." *Id.* (footnote omitted).  Neither defendant nor defendant-intervenors address the

problem that Goodman rebutted the very presumption upon which, according to the

Department's own policy as described in the Preliminary Decision Memorandum, Commerce

imposes the PRC-wide rate.

### III. CONCLUSION AND ORDER

For the reasons discussed in the foregoing, the court is required by the standard of review

applicable in this case to set aside as unlawful and remand to the International Trade

Administration, U.S. Department of Commerce ("Commerce" or the "Department") for

reconsideration the decision published as *Fresh Garlic from the People's Republic of China:*

*Final Rescission of Antidumping Duty New Shipper Review of Shijiazhuang Goodman Trading*

*Co., Ltd.*, 79 Fed. Reg. 22,098 (Int'l Trade Admin. Apr. 21, 2014) ("*Rescission*").  Therefore,

upon consideration of all papers and proceedings in this case, and upon due deliberation, it is

hereby

**ORDERED** that the *Rescission* be, and hereby is, set aside as unlawful and remanded for
reconsideration and redetermination in accordance with this Opinion and Order; it is further

**ORDERED** that Commerce shall issue, within sixty (60) days of the date of this Opinion
and Order, a new determination upon remand ("Remand Redetermination") that conforms to this
Opinion and Order; it is further

**ORDERED** that Goodman and defendant-intervenors, Fresh Garlic Producers
Association, et al., may file comments on the Remand Redetermination within thirty (30) days
from the date on which the Remand Redetermination is filed with the court; and it is further

**ORDERED** that defendant may file a response within fifteen (15) days from the date on
which the last of any such comments is filed with the court.


/s/ Timothy C. Stanceu
Timothy C. Stanceu
Chief Judge

Dated:  March 22, 2016
        New York, New York